**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

FREDDY LOPEZ,

*Plaintiff*,

v.

ALLURE GENERAL CONTRACTING, BAYONNE MUSLIMS ABDUL HAMEED, MOHAMMED ASIM KHAN, USA GENERAL CONTRACTORS CORP. and SKYREACH CONSTRUCTION INC.

*Defendants*.

Civil Action No. 21-8149

**OPINION**

August 3, 2026

**SEMPER**, District Judge

**THIS MATTER** comes before the Court upon Defendants Allure General Contracting ("Allure"), USA General Contractors Corp. ("USA General"), Bayonne Muslims Abdul Hameed ("Bayonne Muslims"), and Mohammed Asim Khan's ("Khan") (collectively, "Defendants") Motions for Summary Judgment, (ECF Nos. 154, "Allure Motion" or "Allure Mot."; 159, "USA General Motion" or "USA General Mot."; 157, "Bayonne Muslims Motion" or "Bayonne Mot."; 155, "Khan Motion" or "Khan Mot." respectively), and Bayonne Muslims' Motion to Preclude Plaintiff Freddy Lopez's ("Plaintiff") Expert Report, (ECF 178, "Preclusion Motion" or "Prec. Mot."). Defendants seek judgment in their favor against Plaintiff's single count of negligence. Plaintiff alleges he was injured while performing construction work on the roof of 109 East 24th Street, Bayonne, New Jersey 07002 (hereinafter the "Premises") in August 2020, and was allegedly "caused to fall" from the roof. (ECF 52, "Third Amended Complaint" or "TAC" ¶ 36.) The Court decided the Motions upon the submissions of the parties, without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons

discussed below, Defendants Allure, USA General, and Bayonne Muslims' Motions for Summary Judgment are **GRANTED**; Khan's Motion for Summary Judgment is **DENIED**; and Bayonne Muslims' Motion to Preclude is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Approximately one year prior to Plaintiff's accident, Defendant Bayonne Muslims "decided to perform a full renovation of the real property located at 107-113 East 24th Street, Bayonne, New Jersey . . . to convert it from a warehouse to a mosque." (Allure SUMF ¶¶ 1-2.) Defendant Khan "considered himself the 'point person' for all trades hired . . . and the 'facilitator' for the Bayonne Muslims renovation project." (USA General Mot. ¶ 5.) Khan hired Skyreach Construction, Inc. ("Skyreach") to perform roofing work at the Premises for Bayonne Muslims. (Opp. at 20; Khan SUMF ¶ 41.)

On the morning of August 6, 2020, Plaintiff was scheduled to perform services for USA General, but was unable to start the job due to rainfall. (USA General Mot. at 6, ¶ 13.) Since the rainfall did not cease, Plaintiff and other laborers were permitted to perform work for Skyreach at a separate location, the Premises. (*Id.*) "Plaintiff was hired by Skyreach to work as a day laborer . . . to remove left over roofing materials and debris" from the roof of the Premises. (*Id.* at 2.) On the day of the incident, the pertinent roofing work was already completed, and the laborers were tasked with removing leftover debris and work materials from the roof. (Opp. at 1.) Plaintiff arrived at the Premises in the USA General work van, accompanied by USA General Foreman Modesto Lopez ("Modesto"), who is Plaintiff's uncle. (Allure Mot. at 7; Allure Mot. Exhibit G, "Deposition of Plaintiff" or "Pl. Dep." at 68:9-13.) Both Plaintiff and Modesto were initially

---

[1] The facts and procedural history are drawn from Plaintiff's Third Amended Complaint; Defendants' briefs in support of their Motions for Summary Judgment, (ECF Nos. 154, 155, 157, 149, 160); Plaintiff's opposition brief, (ECF 164, "Opposition" or "Opp."); and the parties' submissions regarding undisputed material facts ("SUMF"), (ECF Nos. 154-2, "Allure SUMF"; 155-2, "Khan SUMF"; 157-2, "Bayonne SUMF").

employed by USA General and then Skyreach on the day of the incident. (USA General Mot. at 6, ¶¶ 11-13; 9, ¶ 21.)

Plaintiff was carrying a piece of plywood to the roof's edge at the time of his fall. (Bayonne SUMF ¶ 26.) Plaintiff was allegedly attempting to throw debris off of the corner of the Premises rather than using the scissor lift as advised by his coworkers, but the exact circumstances of Plaintiff's fall are in dispute. (*Id.* ¶¶ 25, 27, 30.) Plaintiff argues he experienced serious injuries "due solely and wholly as a result of the careless and negligent manner in that Defendants(s), owned, managed, operated, maintained, controlled, supervised, inspected, repaired, designed, renovated, constructed, the Premises, without Plaintiff … in any way contributing thereto." (TAC ¶ 87.) Plaintiff further argues that he was "caused to suffer severe and serious personal injuries to the mind and body," and "has been unable to attend his usual occupation in the manner required." (*Id*. ¶¶ 90-91.)

At the time of the incident, Modesto had been a foreman for USA General for 18 years. (Khan SUMF ¶ 12.) Modesto further testified that "he was the 'senior person' for the work being done on the roof on the day of Plaintiff's injury." (Allure SUMF ¶ 33.) "Skyreach always paid [Plaintiff] in cash," and following the accident, Modesto provided Plaintiff with an envelope of cash "from Hassan of Skyreach for one and a half days work." (USA General Mot. at 6, ¶ 11.)

In addition to Skyreach, Kahn hired Allure to do work on the Premises around the time of the incident: "Mohd Odeh, principal of Allure, testified that Allure was hired to do 'the civil work: sidewalks, curbs and underground utilities." (Allure SUMF ¶ 12.) Odeh further testified that nobody from Allure was present on the Premises on the day of Plaintiff's accident. (*Id.* ¶ 34.) Neither Plaintiff nor Modesto had met Odeh, and Plaintiff further testified that he "had never considered himself to be an employee of Allure." (*Id.* ¶¶ 35-36.) Although Allure was certified

as the contractor of record for the construction operations at the Premises, their permits did not include a provision for roofing work. (*Id.* ¶¶ 10-11.)

On April 5, 2021, Plaintiff filed a complaint against Allure alleging that "Defendant, failed to provide Plaintiff with a safe workplace and provide proper work equipment to perform his job duties." (ECF 1, "Complaint," or "Compl." ¶ 11.) Allure answered the Complaint and filed a Third-Party Complaint against Khan on September 24, 2021. (ECF 7.) Plaintiff amended his complaint to add Allure as a defendant on September 30, 2021. (ECF 8.) On November 5, 2021, Allure requested the Clerk of the Court enter a judgment of default against Khan for failing to answer the Third-Party Complaint. (ECF 14.) Plaintiff again amended his complaint on May 24, 2022 to add Bayonne Muslims and Khan as defendants. (ECF 23.) On August 24, 2022, Allure filed a motion for default judgment against Khan. (ECF 25.) Khan appeared in this matter on September 27, 2022 and asked this Court to vacate default judgment, which the Court obliged on September 28, 2022. (ECF 36.)

On April 13, 2023, Plaintiff filed the operative Third Amended Complaint, adding USA General and Skyreach as defendants. (*See generally* TAC.) In the TAC, Plaintiff alleges one count of negligence against Defendants. (*Id.*) On July 7, 2023, Plaintiff requested an entry of default against USA General, which the Court did not grant because Plaintiff did not issue Summons against Defendants USA General and Skyreach. (ECF 67.) Plaintiff subsequently requested Summons to be issued against USA General and Skyreach, and default was entered against Skyreach on November 22, 2023. (ECF 68.) On December 1, 2023, Plaintiff filed a motion for default judgement against Skyreach, which was granted in this Court's Opinion and Order dated June 28, 2024. (ECF Nos. 84, 104.)

After proceeding through a lengthy period of discovery, Allure moved for summary judgement on December 3, 2025; Khan moved on December 4, 2025; and USA General and

Bayonne Muslims moved on December 5, 2025. (*See generally* Allure Mot.; Kahn Mot.; USA General Mot.; Bayonne Mot.) Plaintiff filed his consolidated Opposition in response to the Motions on January 5, 2026. (*See generally* Opp.) On May 28, 2026, Bayonne Muslims filed a Motion to Preclude Report and Testimony of Plaintiff's Expert. (*See generally* Prec. Mot.) Plaintiff opposed on June 11, 2026. (ECF 179, "Preclusion Opposition" or "Prec. Opp.") On the same day, USA General filed a cross-motion to join Bayonne Muslim's Motion to Preclude. (ECF 180.) Bayonne Muslims replied to Plaintiff's Preclusion Opposition on June 29, 2026. (ECF 182, "Preclusion Reply" or "Prec. Reply.") USA General did not join the Preclusion Reply.

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

A moving party is entitled to summary judgment if "the record shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law." *Qin v. Vertex, Inc.*, 100 F.4th 458, 469 (3d Cir. 2024). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* A moving party may also be entitled to summary judgment if they "demonstrate that the nonmoving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case'" which that party must prove at trial. *Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter, but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "In considering a motion for summary judgment, a district court may

not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

**B. Motion to Preclude an Expert Report**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Relevant factors for deciding whether expert testimony is admissible under Rule 702 were set forth in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 590 (1993). The Third Circuit has treated *Daubert* as a three-prong test for analyzing expert testimony: (1) Qualifications; (2) Reliability; and (3) Fit. *See In re Paoli R.R. Yard PCB Litig.* (*Paoli II*), 35 F.3d 717, 741-43 (3d Cir. 1994).

As for the qualification prong, "[a] broad range of knowledge, skills, and training" qualify an expert under Rule 702. *Id*. at 741. The Third Circuit held in *Paoli II* that district courts should

adopt a "liberal policy of admissibility extend[ing] to the substantive as well as the formal qualification of experts." *Id*. Therefore, a district court should not scrutinize whether a more qualified expert would be appropriate in the court's opinion, or dismiss expert testimony because it is based on generalized experience instead of formal qualifications such as degrees. *Id*. However, "the level of expertise may affect the reliability of the expert's opinion." *Id*.

The reliability prong requires the expert to testify to "scientific, technical or other specialized knowledge [that] will assist the trier of fact." Fed. R. Evid. 702. Expert opinions based on scientific knowledge require sound methodology and procedures of science rather than assumptions or speculation. *Paoli II*, 35 F.3d at 742 ("*Daubert* explains that the language of Rule 702 requiring the expert to testify to *scientific knowledge* means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation[.]'") (emphasis in original). Factors for assessing whether a methodology rests on "good grounds" include the testability of the expert's hypothesis, whether the methodology has been peer-reviewed, the rate of error, existence and maintenance of standards controlling the methodology, and whether the methodology is accepted in the scientific community. *Id*. (referencing *Daubert*, 509 U.S. at 593-94). Additional relevant factors include the degree to which the expert is qualified, the relationship between the technique and established methods of science, and non-judicial uses to which the expert's technique is put. *Id.* (referencing *U.S. v. Downing*, 753 F.2d 1224, 1238-39 (3d Cir. 1985)). The balancing of these factors is a "flexible one" and the Court should take all into account. *Id*. The party introducing the effort must prove their expert to be reliable by a preponderance of evidence. *Id.* at 744. The factors, however, are not a "checklist" which requires every factor to be present in every case. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 593).

The fitness prong of the *Daubert* analysis requires the Court to decide whether the expert opinion will assist the trier of fact. *Paoli II*, 35 F.3d at 743. "[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*." *Id*. (emphasis in original). A court must therefore decide "whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593.

This Court has also held that a district judge should analyze testimony based on "technical knowledge" different than testimony based on "traditional scientific knowledge." *Crowley v. Chait*, 322 F. Supp. 2d 530, 539 (D.N.J. 2004) ("In such cases of nonscientific testimony, the emphasis is placed not on the methodology of the expert testimony, but on the professional and personal experience of the witness."); *see also Kumho*, 526 U.S. at 153 ([W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."); *Floorgraphics, Inc. v. News Am. Mktg. In-Store Services, Inc.*, 546 F. Supp. 2d, 155, 165 (D.N.J. 2008) ("The [Supreme] Court stated [in *Kumho*] that in non-scientific cases, the *Daubert* factors 'may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of his testimony.'"). In this instance, the analysis in the expert report is primarily of a technical rather than a scientific nature. Therefore, the Court analyzes whether the expert's background supports his ability to offer the conclusions in the report.

## III. DISCUSSION

### A. Motion to Preclude Plaintiff's Expert Report

On April 15, 2025, Mr. Anthony Corrado ("Corrado") of Site Safety Services, LLC prepared an expert report on behalf of Plaintiff. (*See generally*, Prec. Mot. Exhibit B, "Report" or "Rep.") The Report states Corrado's opinion as to why, based on his experience in the construction

industry, the factual record in this case establishes that Defendants are liable for Plaintiff's fall and injuries. (Rep. ¶ 36.) Bayonne Muslims and USA General oppose the inclusion of the Report on the grounds it is unreliable under the *Daubert* standard. (Prec. Opp. at 1.) After considering the submissions of the parties and closely reading the Report, the Court concludes that the Report satisfies the *Daubert* standard and should be included in the record.

Bayonne Muslims argues that the Report is unreliable under *Daubert* because it is "nothing more than impermissible speculation and conjecture." (Prec. Mot. at 3.) Bayonne Muslims supports this argument by pointing to the fact that Corrado did not physically inspect the site of the incident and solely reviewed record evidence obtained during discovery. (*Id.*) Bayonne Muslims further argues that the lack of investigation or corroboration of the record evidence renders the Report unreliable. (*Id.* at 5.) Plaintiff responds that personal inspection supports reliability, but the lack thereof does not defeat it as demonstrated by *Laszlo v. State Farm Fire & Cas. Co.*, No. 23-21529, 2025 WL 2611317, at *16 (D.N.J. Sept. 10, 2025), which Bayonne Muslims cites in its brief. (Prec. Opp. at 10; Prec. Mot. at 9.) He also argues physical inspection of the property would have been futile since Plaintiff retained Corrado several years after the incident, and his reliance solely on record evidence was typical of a person in his position. (Prec. Opp. at 10.)

Bayonne Muslims also argues that the Report offers opinions inconsistent with Corrado's own statements. (Prec. Mot. at 6.) For example, the Report states that there was "no personal fall protection equipment … present on site," (Rep. at 5), but Corrado acknowledged that Plaintiff testified during his deposition that there was a harness available in the van. (Prec. Mot. Exhibit C, "Corrado Deposition" or "Corrado Dep." at 116:20-117:16.)[2] The Court holds that such

[2] Bayonne Muslims also argues that the Report is inconsistent because it stated there was no fall protection equipment on the site, but later states that workers were expected to provide their own

inconsistencies go to the weight of the evidence rather than its admissibility because the testimony is non-scientific and Corrado's personal experience is sufficient to give opinions on this matter. *See Matter of Soued*, 689 F. Supp. 3d 1, 11 (D.N.J. 2023) ("But 'good grounds' do not require that an expert's opinion be perfect. Indeed, an expert opinion is not inadmissible because it may contain flaws." (citing *N.J. Dep't of Envtl. Prot. v. Amerada Hess Corp.*, No. 15-6468, 2019 WL 4052431, at *6 (D.N.J. Aug. 28, 2019)) (cleaned up)). Corrado has worked in the construction industry for over 43 years and has achieved the highest rankings as a Safety Professional with the New York City Department of Buildings. (Rep. at 2.) He has also received national certifications, teaching credentials, and owns a consulting business for construction site safety. (*Id.*) These factors provide a relevant and established foundation for Corrado to provide a technical opinion on how conditions at a job site contribute to a workplace accident. The expert's approach to the facts and evidence, such as the choice not to personally expect the premises, is an issue that goes to the weight of the evidence rather than its admissibility. *See U.S. for Use of Colo. Custom Rock Corp. v. G&C Fab-Con, LLC*, No. 20-2986, 2024 WL 624040, at *11 (D.N.J. Feb. 14, 2024).

Furthermore, Bayonne Muslims contends that the Report misstates the law. The Court agrees that Corrado improperly "invad[ed] the court's province by testifying on issues of law" when he stated that by not hiring a general contractor, Allure assumed the duty to ensure the safety of Plaintiff. (Rep. at 9, ¶ 20); *see Casper v. SMG*, 389 F. Supp. 2d 618, 621 (D.N.J. 2005). The Court agrees with Bayonne Muslims that, to the extent the Report assigns duties to Defendants, the testimony is inadmissible. Furthermore, the testimony regarding duties relies on inaccurate

---

safety equipment. (Rep. at 9, ¶ 22.) The Court disagrees that that is inherently inconsistent, because it is possible for the workers to have been responsible for bringing their own safety equipment but failed to do so. (*See* Prec. Mot. at 6.)

statements of law.[3] (Prec. Reply at 2.) Therefore, it is appropriate to strike testimony from the Report where Corrado opines as to whether any of the Defendants had a duty to protect Plaintiff from the fall because the existence of a duty is a question of law for the Court to decide. *Christakos v. Boyadjis*, 348 A.3d 966, 975 (N.J. 2026). However, the majority of the Report analyzes the record evidence and concludes the operation of the construction project at the Premises fell below industry standards and likely caused Plaintiff's injuries, which is helpful for the trier of fact. The fact that some statements in the Report are contradicted by other record evidence or are not corroborated by an independent investigation goes to the weight of the Report rather than its admissibility. *U.S. for Use of Colo. Custom Rock Corp.*, 2024 WL 624040, at *11.

**B. Defendants' Motions for Summary Judgment**

**1. Allure General Contracting**

Plaintiff named Allure as the first defendant in this action in the initial complaint and every amended complaint that followed. (*See generally* TAC; ECF Nos. 1, 8.) Plaintiff asserts one count of negligence. (TAC.) To survive summary judgment, Plaintiff must demonstrate that he could prove Allure owed a duty of care to him at trial. *Coleman v. Martinez*, 254 A.3d 632, 642 (N.J. 2021). Based on the evidence presented to the Court, Plaintiff is unable to show Allure owed him a duty as a matter of law.

"A duty is an obligation imposed by law requiring one party to 'conform to a particular standard of conduct toward another.'" *Acuna v. Turkish*, 930 A.2d 416, 424 (N.J. 2007) (quoting *Prosser & Keeton on Torts: Lawyer's Edition* § 53, at 356 (W. Page Keeton ed., 5th ed. 1984)). As then-Judge Cardozzo famously articulated in *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339,

[3] For example, the Report concludes that Bayonne Muslims failed to ensure proper oversight of the construction project by not hiring a general contractor. (Rep. at 10, ¶ 25.) However, the decision by a landowner to not hire a general contractor does not violate New Jersey law per se. *Slack v. Whalen*, 742 A.d 1017, 1022 (Super. Ct. App. Div. Jan. 10, 2000).

344 (N.Y. 1928), "[t]he risk reasonably to be perceived defines the duty to be obeyed." *See also G.A.-H v. K.G.G.*, 210 A.3d 907, 915 (N.J. 2019) ("Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists." (quoting *J.S. v. R.T.H.*, 714 A.2d 924, 928 (N.J. 1998))). As Plaintiff stated in his deposition, he was employed by Skyreach at the time of the incident, not Allure. (Pl. Dep. at 20:13-20, 22:20-21.) Since Plaintiff was not working for Allure at the time of the injury, there is no contractual relationship between the parties to serve as the basis for a duty of care. *Cf. Alloway v. Bradlees, Inc.*, 723 A.2d 960, (N.J. 1999) (holding a genuine issue of material fact existed as to whether a contractor owed a duty to an employee of a subcontractor).

Plaintiff argues that Allure owed him a duty due to its status as "the official permit holder of record for the entire project, including building, electrical, plumbing, and fire protection permits."[4] (Opp. at 4.) However, absent from Plaintiff's discussion of Allure's permits is the fact that roofing is not listed under the description of work. (Allure Mot. Exhibit D, "Bayonne Permit" at 7.) Since Allure had no responsibility to perform work on the roof, there is no reason for Allure to be aware of the dangerous nature of the roof work performed, bolstering the argument that no duty should be imposed on Allure. *Carvalho v. Toll Bros. and Developers*, 675 A.2d 209, 214 (N.J. 1996). In his consolidated opposition brief, Plaintiff writes that "[w]hether Allure assumed duties and responsibilities as the permit holder … creates genuine issue[] for trial." Yet as previously discussed, the existence of a duty is a question of law to be decided by the Court,

[4] Public policy is also a relevant consideration in New Jersey when courts determine the existence of a duty, "the determination of the existence of a duty is [ultimately] a question of fairness and public policy." *G.A.-H*, 210 A.3d at 915; *see also Davis v. Devereux Found.*, 37 A.3d 469, 484 (N.J. 2012) ("Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy."). As a matter of public policy, the Court declines to impose liability on Allure because it was properly permitted and insured.

*Christakos*, 348 A.3d at 975, and Plaintiff has not met his burden. Plaintiff has therefore failed to present facts establishing an essential element of his case, entitling Allure to a favorable summary judgment decision. *Mall Chevrolet, Inc.*, 99 F.4th at 630. For these reasons, the Court holds there is no genuine dispute as to whether Allure owed Plaintiff a duty of care on the day of the incident—it did not. Thus, Allure's Motion for Summary Judgment is **GRANTED**.

**2. USA General Contractors**

On the morning of the incident, Plaintiff and Modesto were employed by USA General to perform services for the company, but the workday was cancelled due to rainfall. (USA General Mot. at 2.) Plaintiff and Modesto were subsequently allowed to travel to Bayonne, New Jersey to remove debris left on the roof of the Premises for Skyreach, following repair work that had been completed in the weeks prior. (*Id*. at 3.) USA General claims it "had no contract with anyone to provide any construction services or any labor for the Bayonne Muslims job site" and Plaintiff and Modesto were simply working a "side-job." (*Id*.)

USA General argues they cannot be liable for the injuries Plaintiff incurred while he was working for another employer.[5] (*Id*.) The Report is the only piece of evidence Plaintiff possesses that purports to establish USA General owed Plaintiff a duty of care. USA General further argues, "if the Court excludes or bars the inadmissible net opinions of plaintiff's liability expert … then defendant USA General owed [P]laintiff no duty[.]" (*Id*. at 20.) Plaintiff argues in response that USA General owed Plaintiff a duty because (1) it employed both Plaintiff and Modesto at the time

[5] USA General argues that allegations in the Report of USA General being a contractor for Bayonne Muslims is unsupported by record evidence. (USA General Mot. at 14, 16.) The Court will not go into detail discussing the arguments relating to the Report because the Court has already ruled it is admissible and struck the statements where Corrado opines as to the existence of a duty. Furthermore, the record shows that USA General did not employ Plaintiff at the time of the incident. Instead, he was working within the scope of his employment with Skyreach, as the New York Worker's Compensation Board concluded. (USA General Mot. Exhibit J, at 5.)

of the incident; (2) provided Occupational Safety and Health Administration ("OSHA") safety training to both individuals; (3) Modesto (a foreman for USA General) supervised the incident; and (4) allowing Plaintiff to work a "side job" was inherently dangerous because the safety responsibilities of the job were unclear. (Opp. at 6.) The Court holds that Plaintiff has failed to establish USA General owed him a duty of care.

Plaintiff argues that under a "loaned employee" or "special employer" theory, one employer may be liable to an employee for injuries obtained while working for another employer "controlled" by the first. (Opp. at 31.) Plaintiff cites *Pantano v. New York Shipping Ass'n*, 294 A.3d 1148, 1153-54 (N.J. 2023) to support this proposition. In *Pantano*, the Supreme Court of New Jersey held that an employer's control over an employee, under the test set forth in *Galvao v. G.R. Robert Const. Co.*, 846 A.2d 1215 (N.J. 2004), applies when a defendant "expects to derive a benefit or advantage from an act performed on that party's behalf by another." 294 A.3d at 1153. The court held that "an employer is generally responsible for harm suffered by third parties through any negligent *work-related acts* of its employees." *Id.* at 1153 (emphasis added).

Control can be established by a party by proving "direct control" or "broad control." *Id*. at 1154. Under the direct control method, a party must show the defendant exercised "the right to direct the manner in which the business shall be done … the result accomplished ... [and] how it shall be done." *Id*. Alternatively, a party may show broad control by way of "(1) the 'method of payment'; (2) who 'furnishes the equipment'; and (3) the 'right of termination.'" *Id*. (quoting *Wright v. State*, 778 A.2d 443 (2001)). The status of an allegedly borrowed employee may be decided by a judge at the summary judgment stage. *Id*. at 1156 (holding trial courts may determine whether an employee is controlled by an employer at summary judgment if the evidence is "so one-sided that there are no genuine issues of disputed material facts"). Once control is established, a plaintiff must show a worker furthered an employer's business interests by performing services

for another employer. *Id*. at 1154. Business furtherance is established by showing (1) "'the work being done by the loaned employee is within the general contemplation of the general employer'" and (2) "'the general employer derives an economic benefit by loaning its employee.'" *Id*. (quoting *Galvao*, 846 A.2d at 1221) (citations omitted).

As a preliminary matter, Plaintiff has not established the loaned employer or special employer theory is applicable to this case. In *Pantano*, the corporations in question were both owned by the same individual and jointly leased and occupied the same shipping yard. *Id*. at 1151. Plaintiff does not allege that USA General entered into any agreement with Skyreach for any defined task or purpose. *See id*. at 1154 ("In some situations, an employer, known as a 'general employer,' loans one of its workers to another employer, known as a 'special employer,' for defined tasks or purposes."). In *Pantano*, the alleged general employer advertised the services of the alleged special employer on its website. *Id*. at 1157. Although the *Pantano* case involved employees who worked for both corporate defendants and one of them was a supervisor, the Court finds the instant case to be highly distinguishable.

Even if *Pantano* is on point, a reasonable jury could not conclude that the loaned employee theory applies because Plaintiff cannot show USA General obtained an economic benefit from the work performed at the Premises. Under the light most favorable to Plaintiff, there are facts that show USA General maintained broad control over the work performed. Plaintiff points to the fact that Modesto was OSHA-trained by USA General, supervised the work when the incident occurred, and that USA General's van and equipment were present on site. (Opp. at 30.) Furnishing equipment is a factor establishing broad control under the *Galvao* test, therefore a reasonable jury may determine USA General had broad control over the worksite. *See Pantano*, 294 A.3d at 1154 (holding the question of control should be decided by the jury if "[a]t least some

indicia of control" is present.). However, a reasonable jury could not find the "business furtherance" prong is met under these facts.

USA General neither contemplated roofing work at the Premises to be completed nor retained an economic benefit from the work being performed. Gregory Serevetas, the Vice President of USA General, testified in his deposition that USA General did not perform any work for Bayonne Muslims in 2020. (USA General Mot. Exhibit D, "Serevetas Deposition" or "Serevetas Dep." at 16:7-11.) He also denied ever hearing about Skyreach before the incident. (*Id*. at 18:19-19:8.) No party in discovery has presented an invoice allegedly issued by USA General for work performed at the Premises. (USA General Mot. Exhibit H, "Certification of Randall S. Bruckman" or "Bruckman Cert." ¶ 15; ECF 168, "USA General Reply" at 9.) Nor has Plaintiff alleged USA General gained economically from his labor at the Premises. The Court is convinced that no reasonable jury could conclude USA General derived an economic benefit from the work performed at the Premises. *See Kelley*, 377 F. Supp. 2d at 487 ("A general employer not affiliated with the special employer could be relieved of liability under the business-furtherance test if … the special employee engaged in work outside the contemplation of the general employer."). There is no contract between USA General and Bayonne Muslims or Skyreach, and USA General was wholly uninvolved with the work done at the Premises. (Serevetas Dep. at 16:7-16.) Therefore, USA General had no expectation of nor business interest in the work performed, and the loaned employee theory is not applicable to this set of facts.

The Court concludes that Plaintiff was employed by Skyreach rather than USA General at the time of the injury. *See Pantano*, 294 A.3d at 1154. ("If the general employer either did not expect or intend for the employee to perform the relevant project for the special employer or did not receive a benefit from the employee's work, *then the employee is a borrowed employee in the employ of the borrowing employer*, regardless of who controlled the employee." (emphasis added).

For this reason, USA General owed no duty of care to Plaintiff as a matter of law and there are no material facts in dispute that could find USA General owed a duty of care to Plaintiff. Accordingly, USA General's summary judgment motion is **GRANTED**.

### 3. Bayonne Muslims

In its Motion, Bayonne Muslims argues it owed no duty to Plaintiff at the time of the incident. (Bayonne Mot. at 2.) The organization argues that as a landowner, its only duty was to provide a reasonably safe workplace, and it owed no duty to protect workers on the Premises from hazards inherent to the work its employees were hired to perform. (*Id.*) Plaintiff argues in response that established exceptions to the property owner doctrine may apply, precluding an entry of summary judgment. (Opp. at 10.) The Court holds that Plaintiff has not produced facts showing the exceptions may apply, and finds in favor of Bayonne Muslims.

In New Jersey, landowners are presumed to have no duty to protect the employees of independent contractors from hazards inherent to their work. *Muhammad v. N.J. Transit*, 821 A.2d 1148, 1156 (N.J. 2003); *see also Bussie v. Bloom Org.*, No. L-3593-03, 2007 WL 1425493, at *2 (Super. Ct. App. Div. May 16, 2007) (holding there is no landowner liability "when the property owner engages a contractor to perform work on the premises and the worker is injured in the course of the very work that the contractor or its employee was hired to perform"). This rule applies when the employee is "an experienced laborer hired [] to … perform his tasks amidst the visible hazards."[6] *Muhammad*, 821 A.2d at 1156. In *Muhammad*, the Supreme Court of New Jersey ruled that a landowner owed no duty to an independent contractor's employee who fell through a garage

[6] The record supports a finding that Plaintiff is an experienced laborer. In his deposition, Gregory Serevetas testified that Plaintiff worked for USA General for at least five years as a roofer/laborer and "most of" the workers at USA General were required to have a minimum of ten hours of OSHA training. (Serevetas Dep. at 14:4-15:19.)

roof while performing asbestos removal services. *Id*. at 1157. The court held that the landowner did not act unreasonably by not warning each individual employee about the risks involved from removing asbestos from the garage roof. *Id*. Instead, that duty fell to the independent contractor who hired the plaintiff. *Id*. Like the plaintiff in *Muhammad*, the risk associated with Plaintiff's roofing work needed no explicit warning. As a matter of law, falling off a roof is a risk inherently associated with roof repair services. *See Sutkowski v. Tymczyna*, No. L-2286-07, WL 4721156, at *2 (Super. Ct. App. Div. Nov. 23, 2010) ("Certainly, falling from a roof is a hazard incidental to repairing a roof. Certainly, the plaintiff understood the hazards of the job which he agreed to accept."). The incidental nature of Plaintiff's fall is sufficient to show that Bayonne Muslims had no duty to protect Plaintiff from the fall.

Additionally, the New Jersey Supreme Court ruled that the hiring of an independent contractor to perform the asbestos removal "form[ed] an important part of the analysis in determining the scope of [defendant's] duty and liability" because "in hiring [the independent contractor], [defendant] relinquished control over the means and methods of asbestos removal." *Muhammad*, 821 A.2d at 1154. In this case, Bayonne Muslims hired Skyreach as an independent contractor to perform the roofing services through Khan. (Bayonne SUMF ¶ 7.) In doing so, Bayonne Muslims "relinquished control" over the means and methods of performing roofing work. *See Muhammad*, 821 A.2d at 1154. Bayonne Muslims is therefore presumed to owe no duty of care to protect Skyreach's employees from the harms incidental to roofing work. Plaintiff has not overcome this presumption.

Plaintiff suggests four New Jersey court-recognized exceptions to the landowner premises liability doctrine may apply. (Opp. at 10.) Without applying the doctrines to the facts of this case, Plaintiff lists exceptions including when a landowner: (1) retains control over means and methods of work; (2) creates or maintains dangerous conditions; (3) undertakes an effort to supervise safety;

and (4) engages in inherently dangerous activities. (*Id.*) None of these exceptions apply here as a matter of law.

As previously established, Bayonne Muslims undisputedly relinquished control over roofing work when Skyreach was hired as a contractor to perform roofing services. *See Muhammad*, 821 A.2d at 1154. The record also supports this finding. (*See* ECF 155-8 Exhibit G, "Khan Deposition" or "Khan Dep." at 27:8-18.) Plaintiff points to no evidence suggesting Bayonne Muslims undertook an effort to supervise safety. Furthermore, working on a roof is not an inherently dangerous activity as a matter of law. *See Robayo v. Rosso*, No. A-1913-17T3, 2019 WL 178161, at *3 (Super. App. Div. Jan. 14, 2019) (holding roof repair work is not an inherently dangerous activity); *Bussie*, 2007 WL 1425493, at *3 ("[T]he dangers inherent in a flat roof or any roof for that matter, including the risk of a fall[.]"). Plaintiff has not shown that Bayonne Muslims created or maintained the hazard that cause Plaintiff's injuries. Plaintiff lost his footing after the roof became wet from rainfall. (Pl. Dep. at 74:24-75:2.) Plaintiff had mops available to him at the time the roofing work was being completed, but either decided not to use the mops or was told not to use the mops to dry the wet areas where he was working by his supervisor. (*Id.* at 70:9-71:2.) Plaintiff was aware of the rainfall that occurred earlier in the day because he left the USA General jobsite due to the rain that same day. (*Id.* at 110:16-22.) Based on these facts, the Court finds that no reasonable jury could find that any of the exceptions to the landowner premises liability doctrine applies in this case. Thus, the Court must enter summary judgment in favor Bayonne Muslims and **GRANTS** its Motion.

**4. Khan**

In his Motion, Khan argues that he should be protected by the same landowner premises liability doctrine as Bayonne Muslims. (Khan Mot. at 7.) He refers to himself as an "agent" of Bayonne Muslims, insisting "[n]either, by contract or by conduct, did Bayonne Muslims or Mr.

Khan assume a duty to protect Skyreach roofers on August 6, 2020. There was no effort on the part of the property owner to exercise supervision or control of the construction or responsibility to maintain safe conditions." (*Id*. at 8, 19.) Plaintiff argues Khan had a more involved role in managing the construction work and whether he exercised control and supervision over the project is a material fact in genuine dispute. (Opp. at 4.) The Court agrees with Plaintiff and holds that whether Khan exercised control over the construction site at the time of Plaintiff's injury is a genuinely disputed material fact ripe for trial.

It is well established that general contractors may be liable for a subcontractor's negligence "where he retains control of the manner and means of doing the work contracted for" or "where he knowingly engages an incompetent subcontractor[.]" *Guerini v. Vin-Rick Builders,* LLC, No. A-1315-24, 2026 WL 1074262, at *2 (Super. Ct. App. Div. Apr. 21, 2026); *see also Sanchez v. Indep. Bus Co., Inc.*, 817 A.2d 318, 321 (Super. Ct. App. Div. Feb. 20, 2003). In *Alloway v. Bradlees*, the New Jersey Supreme Court articulated several factors courts should consider when determining the status of a potential independent contractor. *Alloway*, 723 A.2d at 964-64. The most important of these factors include the foreseeability of the risk of injury, the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. *Id*. at 964. While the Court cannot conclude that each of these factors falls in favor of imposing liability on Khan, there are sufficient facts in the record to dispute their applicability to Khan.

The facts of the case create a dispute as to whether the risk of harm here was foreseeable. Whether a risk is foreseeable is a question of fact to be decided by a jury. *Komlodi v. Picciano*, 89 A.3d 1234, 1252 (N.J. 2014). A jury may find that Plaintiff's fall through roof was foreseeable because it is an inherent risk of performing roofing services. *Rivera v. PNL Jersey Properties*, No.

A-2266-17T4, 2019 WL 1324378, at *3 (Super. Ct. App. Div. March 25, 2019) ("The risk of a fall through the roof was foreseeable.").

A reasonable jury could conclude that Khan was acting as a general contractor and fell short of his responsibility to ensure the safety of contract workers. Khan is a civil engineer who has worked in the construction industry for several years. (Khan SUMF ¶ 38.) Khan hired Skyreach to perform roofing services without creating documentation establishing responsibilities to ensure the safety of the workers. (Rep. at 7, ¶ 13.) In *Alloway*, the Supreme Court held a relationship existed between the parties because there was a "clear connection between plaintiff's performance on behalf of [the subcontractor] and [the general contractor's] own contractual interest." 723 A.2d at 966. Here, there are facts pointing to a similar connection. Khan entered into an agreement with Skyreach, Plaintiff's employer, for the performance services on the Premises' roof. (Khan Dep. at 78:6-79:6.) Khan received an invoice from Skyreach "for the roofing work." (Khan Mot. Exhibit J, at 4.) This relationship created opportunities for Khan to exercise control over Skyreach's operations, including making sure OSHA standards were met, which they were not. (*See* Rep. at 10, ¶ 25 ("Asim Khan, acknowledging that the building committee had entrusted him with oversight responsibilities, and despite his professional engineering credentials, lacked OSHA certification and failed to implement or monitor essential safety protocols.")). Viewing the evidence in the light most favorable to Plaintiff, Khan had sufficient authority over the construction project to ensure OSHA and general safety standards were met, which could have prevented Plaintiff's fall from occurring. Trial is appropriate to decide facts from which the Court can determine the existence of a duty. *See Costa v. Gaccione*, 975 A.2d 362, 373 (Super. Ct. App. Div. May 27, 2009) (holding a general dispute of material fact as to whether defendant was *de facto* general contractor, the foreseeability of the plaintiff's injury, and the relationship between the parties precluded summary judgment); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

The Court is further persuaded that a genuine dispute of material fact exists regarding Khan's role during the construction project because he held himself out to be the general contractor on multiple occasions. In his moving brief, Khan states he did not supervise or control the manner or method of work performed, (Khan Mot. at 22), yet he admitted in his deposition that he portrayed himself as a general contractor with Allure to the City of Bayonne and others. (Khan Dep. at 57:20-59:2, 61:14-21, 73:3-76:2.) There is also a dispute over whether Khan fraudulently used another company's license to acquire permits for the construction project, further obscuring his actual role during the relevant period. (*Id*. at 52:10-54:19, 69:16-70:5.) A jury may find Khan owed and breached a duty based on non-compliance with OSHA regulations and New Jersey statutes. (Rep. at 10-12, ¶¶ 28-35); *see Costa*, 975 A.2d at 376-73 ("[V]iolations of OSHA are to be considered with other 'fairness' factors in determining the existence of a duty and the duty's scope."). Even if a jury makes this finding, Plaintiff will still be required to prove Khan actually and proximately caused his injury. *Thorn v. Travel Care, Inc.*, 686 A.2d 1234, 1237 (Super. Ct. App. Div. Jan. 14, 1997) ("[P]laintiff has the burden of proving by a preponderance of the evidence that a defendant's negligent conduct is a cause-in-fact of the plaintiff's injury."). The Court will allow Plaintiff an opportunity to make his case to the jury due to the dispute over Khan's control over the worksite. Accordingly, Khan's Motion for Summary Judgment is **DENIED**.

## IV. CONCLUSION

For the reasons stated above, Bayonne Muslims' Motion to Preclude is **DENIED**; Allure, USA General, and Bayonne Muslims' Motions for Summary Judgment are **GRANTED**; and

Khan's Motion for Summary Judgment is **DENIED**. Plaintiff's negligence claim against Khan survives, and an appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig: Clerk
cc: Jose R. Almonté, U.S.M.J.
Parties